CHEVREMONT ET AL v. EL PUEBLO DE PUERTO RICO.

APELACIÓN procedente de la Corte de Distrito de San Juan.

No. 1.—Resuelto en Enero 23, 1903.

LOTERÍA PROVINCIAL.    BILLETES.—Los billetes de la Lotería Provincial eran valores del Estado y documentos al portador, y de no verificarse el sorteo la Administración estaba obligada á devolver su importe á los tenedores de los mismos.

ID.—Un contrato aleatorio que no se oponga á la ley, es válido y exigible.

CONTRATOS.—Las estipulaciones de un contrato válido deben regir sin referencia á materias extrínsecas, á no mediar disposición expresa para tal referencia.

LOTERÍAS.—La trasmisión de billetes de lotería por correo está prohibida por las leyes postales de los Estados Unidos, pero no lo están las loterías por las leyes generales de los mismos.

BILLETES DE LA LOTERÍA PROVINCIAL.—Al emitir y vender billetes de lotería, bajo las leyes entonces vigentes, la Diputación Provincial de Puerto Rico contrajo la obligación de celebrar los sorteos correspondientes á los mismos, y al no hacerlo así, por incumplimiento de esa obligación, los tenedores de dichos billetes tienen derecho á la devolución del dinero pagado por ellos, quedando el Gobierno obligado á satisfacer sus reclamaciones.

EXPOSICIÓN DEL CASO.

El presente caso es una apelación interpuesta por el Pueblo de Puerto Rico en un pleito contencioso-administrativo seguido por Don Luis Chevremont y otros contra la Oficina Liquidadora de la extinguida Diputación Provincial, sobre reintegro del valor de billetes de lotería, siendo la sentencia apelada, copiada literalmente, la siguiente:

En la Ciudad de San Juan de Puerto Rico á los cuatro días del mes de Octubre de 1901. Visto este recurso contencioso-administrativo seguido entre partes de la una el Letrado Don Antonio Alvarez Nava y Lobo, en representación de Don Luis Chevremont, Don Adolfo Robert, Don Andrés Cueto, Mullenhoff y Korber, Don Pedro Cardona, Rivera y Ca., Cerecedo Hermanos y Ca., Don Pedro Giusti y Don Anfiloquio Gándara, tenedores de billetes de la Lotería, contra la Oficina Liquidadora de la extinguida Diputación Provincial, sobre reintegro del valor de billetes de los que son tenedores, representada esta Corporación por el Ministerio Fiscal.

*Resultando:* que abolida por la Orden General No. 17, de 20 de Noviembre de 1898, la Corporación denominada "Diputación Provincial de Puerto Rico", por considerarla el Gobierno Militar de la Isla, innecesaria é

## CHEVREMONT ET AL v. THE PEOPLE OF PORTO RICO.

### APPEAL from the District Court of San Juan.

No. 1.—Decided January 23, 1903.

TICKES OF THE PROVINCIAL LOTTERY.—The "Diputación Provincial" of Porto Rico in issuing and selling lottery tickets, under the laws and regulations then in force, contracted an obligation to carry out the drawings thereof, and having failed to do so, the non-fulfillment of that obligation entitles the holders of such tickets to the reimbursement of the money paid by them, the Government of Porto Rico being bound to satisfy their claims.

### STATEMENT OF THE CASE.

This is an appeal taken by The People of Porto Rico in a "litigative-administrative" action instituted by Luis Chevremont and others, against the Liquidating Commission of the late "Diputación Provincial", for the recovery of the value of lottery tickets, the judgment appealed from being literally as follows:

"In the City of San Juan, Porto Rico, this 4th, the day of October, 1901, in the matter of a litigative-administrative action instituted by Antonio Alvarez Nava, Esq., on behalf of Luis Chevremont, Adolfo Robert, Andrés Cueto, Mullenhoff & Korber, Pedro Cardona, Rivera & Co., Cerecedo Hermanos & Co., Pedro Giusti and Anfiloquio Gándara, holders of lottery tickets, against the Liquidating Commission of the late "Diputación Provincial", for reinbursement of the value of lottery tickets held by them, said Corporation being represented by the Attorney General.

I.—The Corporation known as the "Diputación Provincial" of Porto Rico, having been abolished by General Order No. 17, of November 20, 1898, of the Military Government of the Island, which held that it was unnecessary and incompatible with the Administration of public affairs, its various functions to be distributed among the Departments of "Gobernación", "Fomen-

incompatible con la Administración de los negocios públicos, distribuyéndose sus atribuciones entre las Secretarías de Gobernación, Fomento y Hacienda, en dicha fecha existentes, y creándose á la vez una Comisión para averiguar los fondos y responsabilidades, y distribuir el mismo entre los diferentes Departamentos mencionados, se nombró un liquidador que presentó un estado, que motivó la Orden General No. 84 de 18 de Abril de 1900, para que todos los créditos pendientes contra la Corporación abolida fuesen presentados y satisfechos á la brevedad posible, haciéndose efectivas las deudas á favor de ella, nombrándose una nueva Comisión para recibir, oir y resolver todas las reclamaciones contra la Corporación extinguida, ú originadas en contratos con ella, que se presenten dentro de seis meses á partir de la fecha de esa orden, que entre otras prescripciones contiene la de que si el Gobernador no aprobase la adjudicación, ó el dictámen de la Comisión no fuera unánime, ó el interesado no aceptare el fallo, el certificado de él, con la reclamación y pruebas en que se apoya, se remitirán por el Gobernador á este Tribunal, con las observaciones que él tuviere por conveniente someter sobre el particular, procediéndose á reconsiderar y resolver por lo contencioso-administrativo.

*Resultando:* que Don Luis Chevremont, Don Adolfo Robert, Don Andrés Cueto, Mullenhoff y Korber, A. Rivera y Ca., Cerecedo Hermanos y Ca., Anfiloquio Gándara, Don Pedro Cardona, y Don Pedro Giusti, presentaron á la Comisión Liquidadora sus respectivos escritos, manifestando poseían billetes pertenecientes á los dos últimos sorteos de la Lotería Provincial de Puerto Rico, formando los del primero, ciento veinte y siete ejemplares que al tipo oficial de dos pesos cuarenta y dos cincuenta céntimos de centavos, monta trescientos siete pesos noventa y siete centavos, moneda provincial, jurando en su escrito pertenecen á los dos últimos sorteos y expresando en la lista que sesenta y tres y nueve décimos de billetes son del sorteo número 2 de 5 de Abril de 1898; el segundo, tres mil quinientos nueve billetes del sorteo ordinario número 382, que debió celebrarse el 20 de Mayo de 1898, más diez y nueve y cinco décimos del extraordinario de 5 de Agosto del mismo año, valor ocho mil quinientos cincuenta y seis pesos sesenta y un centavos de igual moneda, á dos pesos cuarenta y dos y medio centavos; el tercero, ciento ochenta y cuatro billetes del sorteo número 382, de 20 de Mayo, ascendentes á cuatro cientos cuarenta y seis pesos veinte centavos de la misma moneda; el cuarto, doscientos diez y ocho billetes dél sorteo número 382, montante á quinientos veinte y ocho pesos sesenta y cinco centavos, de igual moneda, á dos pesos cuarenta y dos y medio centavos; el quinto, cincuenta y dos billetes siete décimos del extraordinario de 5 de Agosto que con dos cartas de pago, números 11 y 40 de fianza de acciones de billetes, forman todo un total de ciento setenta y seis pesos cincuenta y cinco centavos; el sexto, trescientos noventa y nueve billetes cuatro décimos del sorteo número 382 y ciento sesenta y nueve dos décimos del extraordinario número 2 ascen-

to " and "Hacienda ", then existing, a Commission was created to ascertain the amount of its assets and liabilities and to distribute the same among the aforesaid Departments. A liquidator was appointed who presented a statement which prompted the promulgation of General Order No. 84, of April 18, 1900, providing "that all outstanding claims, against the abolished Corporation be presented and disposed of as speedily as possible, and the debts due the said body be collected"; and constituting "a new Commission to receive, hear and decide upon all claims against the said late "Diputación Provincial ", or arising out of such contracts with that body as may be presented within the period of six months from the date of said order ", which among other provisions contains one to the effect that "in case any award of the Commission shall be disapproved by the Governor, or where the decision of the Commission is not unanimous, or where the claimant declines to accept the award of the Commission, the certificate of said award, together with the claim and the evidence in support thereof, shall be forwarded by the Governor to this Court, with such statement as the Governor shall desire to submit in the premises, and thereupon this Court shall proceed to consider and determine the claim under the proceedings known as "Contencioso-Administrativo ".

II.—Luis Chevremont, Adolfo Robert, Andrés Cueto, Mullenhoff and Korper, A. Rivera & Co., Cerecedo Hermanos & Co., Anfiloquio Gándara, Pedro Giusti and Pedro Cardona, filed with the Liquidating Commission their respective petitions setting forth that they held tickets pertaining to the two last drawings of the Provincial Lottery of Porto Rico; those of the first being one hundred and twenty-seven, which at the official rate of two forty-two and a half *pesos*, amounted to three hundred and seven *pesos*, and ninety-seven *centavos*, provincial money. In their petition they made oath that these tickets belonged to the two last drawings, and in the list it was stated that sixty-three and nine-tenths tickets appertained to drawing No. 2 of April 5, 1898; those of the second petitioner consisted of three thousand five hundred and nine tickets of the regular drawing No. 382 that should have been held on May 20, 1898, and nineteen and five-tenths of the extraordinary drawing of August 5th, same year, amounting to eight thousand five hundred and six *pesos*, sixty-one *centavos*, of the same money, at two forty-two and a half *pesos* each ; those of the third, one hundred and eighty-four tickets of drawing No. 382 of May 20th, amounting to four hundred and forty-six *pesos*, and twenty *centavos*, same money; the fourth held two hundred and eighteen tickets, of drawing No. 382, amounting to five hundred and twenty-eight *pesos*, and sixty-five *centavos*, same money, at two forty-two and a half *pesos;* the fifth held fifty-two and seven-tenths tickets of the extraordinary drawing of August 5th, which, with two acquittances, Nos. 11 and 40, for security on account of reserved tickets, aggregate one

diendo todo á mil trescientos setenta y ocho pesos ochenta y cinco centavos provinciales; el séptimo, tres billetes ocho décimos del extraordinario número 2, de 5 de Agosto de 1898, ascendente á nueve pesos veinte centavos de la misma moneda; el octavo, noventa y siete billetes siete décimos del extraordinario número 2 citado, que montan á doscientos treinta y seis pesos noventa y dos centavos de la repetida moneda; y el noveno, ciento veinte y ocho billetes nueve décimos del número 382 referido, que importan trescientos doce pesos cincuenta y ocho centavos de dicha moneda; acompañando cada uno la correspondiente lista expresiva de los números de los billetes y décimos que entregaron según los escritos ó facturas.

*Resultando :* que para resolver esas reclamaciones se unieron, y aparecen de las constancias remitidas, copia de la Real Orden, expedida por el Ministerio de Ultramar del Gabinete Español en 27 de Julio de 1876, publicada en la Gaceta de Puerto Rico de 17 de Agosto del mismo año, autorizando á la Diputación Provincial de esta Isla para establecer una Lotería Provincial y en virtud de ella se incluyeron los productos de ella en el Presupuesto de 1877 á 78, vendiéndose los billetes á dos pesos cuarenta y dos y medio centavos cada uno, moneda de Puerto Rico, suspendiéndose el sorteo número 382 y el extraordinario número 2 ; apareciendo al mismo tiempo la opinión de dos comisionados contraria al abono de la reclamación, porque la Lotería es una institución que tiende á degradar y empobrecer la sociedad en que florece ; porque de la declaración jurada de los reclamantes no se puede saber si los billetes fueron obtenidos directamente de la Diputación ó de agentes autorizados y porque unos billetes debían sortearse el 20 de Mayo de 1898 y otros, el número dos, en 5 de Abril del 98, que es el sorteo número dos, los que deberían ser de acuerdo con el memorandum, cuando la declaración del Sr. Larroca aparece que el sorteo número dos debía haberse llevado á cabo en Agosto 5 de 1898 : que la Loteria se vió obligada á suspender el sorteo por la guerra y no llevarlo á efecto después por las leyes de los Estados Unidos ; que es una verdad estaba autorizada por el Gobierno Español y el producto dedicado á su servicio y sostenimiento ; que no hay Real Decreto ni Reglamentos y Estatutos que autoricen la indemnización á los compradores por no llevarse á cabo el sorteo pues lo hacía á su riesgo, que la equidad y recta conciencia es lo único que favorece al comprador de billetes para devolverle su dinero en ese caso ; que si el sorteo se hubiera celebrado, un número limitado de premiados se hubieran beneficiado ; que si existiera algo de contrato ó derecho que á la Diputación obligara á devolver en equidad y recta conciencia, la Guerra es tal motivo que relevaría á la Diputación de pagar ; siendo el del otro comisionado favorable al pago y fundado en lo siguiente : que no pudiendo celebrarse el Sorteo por culpa de la Diputación Provincial, no puede legalmente apropiarse el dinero para atender con él á sus obligaciones, debe devolverse el dinero que se cobró al

hundred and seventy-six *pesos*, and fifty-five *centavos;* the sixth held three hundred and ninety-nine and four-tenths tickets of drawing No. 382, and one hundred and sixty-nine and two-tenths of extraordinary drawing No. 2, the whole amounting to one thousand three hundred and seventy-eight *pesos*, and eighty-five *centavos*, provincial money; the seventh held three and eight-tenths tickets of extraordinary drawing No. 2, of August 5, 1898, amounting to nine *pesos*, and twenty *centavos*, same money; the eight held ninety-seven tickets and seven-tenths of extraordinary drawing No. 2, aforesaid, amounting to two hundred and thirty-six *pesos*, and ninety-two *centavos*, same money; and the ninth held one hundred and twenty-eight and nine-tenths tickets of No. 382 aforesaid, amounting to three hundred and twelve *pesos*, and fifty-eight *centavos*, same money. Each of the claimants presented a list showing the numbers of the tickets, and fractions of tickets, which they delivered in accordance with their respective petitions or invoices.

III.—For the purpose of deciding the aforesaid claims, there was attached thereto, and appears in the record, a copy of the Royal Order issued by the Minister of the Colonies, of the Spanish Cabinet on July 27, 1876, published in the *Official Gazette* of Porto Rico, August 17th, of the same year, authorizing the "Diputación Provincial" of this Island, to establish a Provincial lottery, pursuant to which order the proceeds of said lottery were included in the budget of 1877-78, the tickets being sold at two forty-two and a half *pesos* each; regular drawing No. 382, and extraordinary drawing No. 2, of aforesaid lottery having been suspended. There also appears in the record opinions of two members of the Commission opposing the allowance of the claims on the ground that the lottery is an institution which tends to degrade and impoverish the community in which it flourishes; that from the affidavit of the claimants it was impossible to know whether the tickets had been obtained directly from the "Diputación", or from authorized agents; and because the drawing of some of the tickets was to have taken place on May 20, 1898, and that of the others, those of No. 2, on April 5, 1898, which should agree with the memorandum, whereas from the declaration of Larroca it appears that drawing No. 2, was to have been held on August 5, 1898; that the drawing of the lottery had to be suspended on account of the war, and could not take place afterwards by reason of the laws of the United States; that it is true that it was authorized by the Spanish Government, and its proceeds applied to the service and maintenance thereof; that there was no Royal Decree, Regulation or Statute authorizing any indemnification to purchasers in case the drawing should not take place, this being a risk taken by each purchaser; that only by equity and fairness could a purchaser of lottery tickets expect to have his money returned to him in such cases; that if the drawing had been held, only a limited number of prize-winners would have been benefited; that if there existed anything in

público por la venta de billetes, porque este asunto debe resolverse por la Ley Española que regía cuando se vendieron con consentimiento de la Ley y sería inmoral que una oficina pública sacara el dinero con engaño al público y luego lo destinara al pago de servicios públicos, no implicando el estado de guerra, porque al desaparecer ese estado debió la Diputación celebrar los sorteos ó devolver el dinero que había percibido por la venta de los billetes, debe devolverse el valor de los billetes vendidos pertenecientes á los sorteos no celebrados.

*Resultando:* que el Letrado Don Antonio Alvarez Nava, acompañando las comunicaciones remitidas á los mencionados peticionarios, participándoles que sus reclamaciones habían sido enviadas por el Gobernador á la Corte de Distrito de San Juan á los efectos del párrafo 6 de la Orden General No. 84 serie 1900, se mostró parte á nombre de los nueve antes indicados, pidió se le entregue lo remitido por el Sr. Gobernador para formular la demanda, á lo que se accedió y en su escrito sienta los hechos antes expuestos y además que la Comisión Liquidadora desestimó la solicitud notificada, á unos, el 8, á otros, el 11, y á los demás el 15 de Junio, siendo esa cuestión contenciosa, que el término es de tres meses para interponerla, que los interesados tienen personalidad, citando los artículos 1 y 7 de la Ley de lo Contencioso, el Párrafo 6 de la Orden General número 84 citada y los artículos 1091 y 1124 del Código Civil, y termina suplicando que en definitiva se resuelva se pague á sus representados la cantidad á que asciende el precio de los billetes de cada uno con el interés del seis por ciento desde la fecha que debieron celebrarse los sorteos respectivos hasta la del pago, cuyo escrito del 27 de Junio próximo pasado se tuvo por presentado, confiriendose traslado al Ministerio Fiscal.

*Resultando:* que dicho Ministerio Fiscal pide se desestime la demanda declarando no se está obligado á pagar á los reclamantes cantidad alguna en concepto de billetes de los sorteos dejados de celebrar por causa de fuerza mayor, con las costas al actor, sentando como hechos: la autorización concedida á la Diputación Provincial por Real Orden, la que empezó en 1877, que con motivo de la guerra se dificultó la venta de los billetes, y no pudieron celebrarse los sorteos correspondientes al 15 de Julio y 5 de Agosto de 1898; que se suprimió la Diputación por Orden General No. 17 de 1898, no pudiendo celebrarse los sorteos pendientes por estimar el nuevo Gobierno era inmoral el juego de Lotería; que se creó una Comisión Liquidadora á la que se presentaron reclamaciones de tenedores de billetes, la que resolvió no eran justas ni debían pagarse las cantidades reclamadas, entablándose recurso contencioso contra dicha resolución, de acuerdo con las leyes vigentes, y como derecho que la Lotería era prohibida por inmoral por las leyes que actualmente rigen: que el comprador es un jugador que arriesga su dinero á los azares de la fortuna; que las leyes nada determinan lo que deba

the nature of a contract or right by reason of which equity and fairness would require the "Diputación" to reimburse the purchase-money, the war was sufficient cause to release it from such an obligation. The other member of the Commission favored the return of the money to the claimants, for the following reasons: That inasmuch as it was through the fault of the "Diputación" that the drawing did not take place, said Corporation had legally no right to appropriate the money for the purpose of meeting its own obligations; that the money collected from the public through the sale of tickets must be returned, because this matter should be decided in accordance with the Spanish law in force when the sale was made in conformity to the law, and it would be immoral for a public office to take money under false pretenses from the public, and then apply the same to the payment of public services; the state of war being no excuse, because as soon as said cause disappeared, the "Diputación" should have either proceeded with the drawings or returned the money it had received from the sale of tickets belonging to the drawings that had not taken place.

IV.—Antonio Alvarez Nava, Esq., having entered an appearance on behalf of the nine claimants aforesaid filed therewith the communications addressed to aforesaid petitioners, notifying them that their claims had been referred by the Governor to the District Court of San Juan, pursuant to paragraph 6, of General Orders No. 84, Series of 1900, and asked for the papers that had been forwarded by the Governor, in order to draw the complaint. This being granted, he set out in his complaint the foregoing facts, stating further that the Liquidating Commission had dismissed the petitions of some of the claimants on the 8th, that of others on the 11th and those of the rest on the 15th of June; that inasmuch as the question at issue was one of a "litigative-administrative" character, the period within which an action could be brought was three months; that the parties concerned have capacity to sue; citing articles 1 and 7 of the Law of Litigative-Administrative matters, paragraph 6, of aforesaid General Orders No. 84, and articles 1091 and 1124 of the Civil Code, he prayed that the question be finally decided by ordering that claimants be paid the amount of the cost of their tickets with interest at six per cent reckoned from the date when the drawings should have taken place to that of payment. This complaint, dated the 27th of June last, was admitted and notice thereof served upon the Office of the Attorney General.

V.—The representative of said Department, the Fiscal, asked that the complaint be dismissed on the ground that there is no obligation to pay the claimants any sum of money on account of tickets pertaining to lotteries the drawings of which had not taken place owing to *force majeure*, with costs against the plaintiffs, and alleged as facts: the authorization granted the "Diputación Provincial" by Royal Order, which took effect in 1877; that

hacerse, caso de que no pueda celebrarse un sorteo de una Lotería y vendido billetes de la misma, que los billetes se colocaban en la Isla y extrangero á superior precio del oficial que obtenían los acaparadores, siendo objeto de comercio, y salidos de la Diputación nada tenían que ver con ellos; que nunca se supuso el reembolso caso de faltar algún sorteo, tomándolos el comprador sin ningún convenio expreso sobre el particular y que ninguna responsabilidad tiene la Diputación y el Tesoro de Puerto Rico, por ser caso de fuerza mayor.

*Resultando;* que contestada la demanda, estando las partes conformes con los hechos, no cabe el recibimiento á prueba, se ordenó formar el extracto, y hecho, se señaló día para la vista, informando las partes en este juicio, alegando lo que á su derecho corresponde, según sus pretensiones escritas y habiéndose observado en la tramitación de esta instancia las reglas del procedimiento.—Siendo ponente el Sr. Juez Asociado Don Juan Morera Martinez.

*Considerando:* que si bien el juego de la Lotería fomenta un vicio funesto á la tranquilidad de las familias y á la prosperidad del Estado, por la grave influencia sobre las costumbres, desanimando más ó menos la fuerza industriosa del hombre, siendo por ello un error económico, social y de Gobierno consentirla, y por ello está prohibido por disposiciones de los Estados Unidos de Norte América, no es menos cierto que aquí establecida por la Diputación Provincial, desde 1877-78, con permiso del Gobierno Supremo que existía antes de la ocupación Americana, creándose como un recurso ordinario del presupuesto de ingreso de la Diputación Provincial, en el que vino figurando percibiendo el veinte por ciento del total de cada sorteo para ella, el que utilizaba en pagar sus servicios, entregando además al Estado un cinco por ciento del total como ayuda á su presupuesto, quien contaba con ese ingreso, y en su presupuesto aparecía, quitándole esos actos á la Lotería el carácter de juego ilícito ó no permitido legalmente, por más que aquellos caracteres, al principio expuestos, no pudieran borrarse ni desaparecer.

*Considerando:* que dando la Administración y el Gobierno el caracter de un recurso análogo á las demás rentas, ó sea como un servicio explotado por ambos para tener una cantidad de ingresos con que atender á sus gastos, no es posible, mientras el Gobierno no la prohibiera, aplicar á actos anteriores á esa prohibición los razonamientos en que la prohibición hoy se funda, no solo porque la ley no puede tener efecto retroactivo, si porque nadie puede enriquecerse con perjuicio de otro que ejercitaba un legítimo derecho bajo el amparo de una administración y ley, entregando los billetes, percibiendo su importe, para hacer el sorteo y pagar los premiados, pues sin esa solemne obligación ningún valor hubieran tenido ni nadie los hubiera buscado.

*Considerando:* que los billetes de la Lotería Nacional se consideraban y consideran aún en la Península "valores del Estado" y "documentos al portador", quedando los que los falsifiquen, enmienden ó alteren sujetos á

by reason of the war the sale of tickets was rendered difficult, and the drawings of July 15th, and August 5, 1898, could not be effected; that the " Diputación" was abolished by General Order No. 17, of 1898, and the drawings could not be held as the game of .lottery was held to be immoral by the new Government; that a liquidating commission was created to which were presented claims of ticket-holders, the decision of said commission being to the effect that these claims were not just and should not be paid; whereupon an appeal had been taken to the tribunal having cognizance of administrative cases, under the laws in force. And from a legal point of view he alleged that lottery was prohibited by existing laws as being immoral; that the purchaser of tickets is a gambler who risks his money on the hazards of fortune; that the laws do not provide what should be done in case the drawing of a lottery could not take place, after selling tickets thereof; that the tickets were sold in the Island, and in foreign countries at a price higher than the official one paid by speculators, being treated as articles of commerce, and when they once left the hands of the "Diputación" the latter had nothing further to do with them; that a reimbursement had never been contemplated in the event of the failure of a drawing to take place, purchasers of tickets accepting them without any express agreement upon this point, and that no responsibility attaches to the "Diputación" and the Treasury of Porto Rico, the case being one of *force majeure.*

VI.—The complaint having been answered, and the parties agreeing as to the facts, there is no necessity for the taking of evidence. An abstract of the case was ordered to be made, and a day was set for the hearing, the parties being cited to appear, argued in support of their respective claims as set forth in the pleadings. All the rules of procedure have been observed in the hearing of this case. Associate Judge, Juan Morera Martinez, having prepared the following decision:

I.—Although it is true that the game of Lottery encourages a vice, which is fatal alike to the tranquility of families and the prosperity of the nation, because of its pernicious influence upon the customs of the people, wherefore to permit it is an economical, social and administrative error, it being for these reasons prohibited by the laws of the United States of North America, yet, it is no less true, that it was established here by the "Diputación Provincial" and has been in existence since 1877-78, with the consent of the Home Government; that it existed before the American occupation, having been created as an ordinary source of revenue and included in the budget of the "Diputación Provincial", which retained twenty per cent of all the proceeds of each drawing toward meeting its expenditures, five per cent of said proceeds being turned over to and counted on by the State, and included in its budget, which facts exempt the Lottery from the characterization of an illicit

las prescripciones del Código Penal, y con arreglo á esa disposición legal, los de la Provincial eran igualmente considerados y sujetos, en los casos antes expresados, á dichas prescripciones penales, demostrando todo que teniendo dicho carácter debe ser devuelto su importe cobrado por la Administración por no haberse efectuado los sorteos á que ellos se refieren.

*Considerando:* que quien se aprovecha de un contrato pidiendo la entrega del precio y obteniéndolo, reconoce virtualmente su validez; y como el aleatorio de suerte, que es el celebrado, no lo fué contra precepto expreso de una ley prohibitiva que existiera en el momento de efectuarse, su validez no puede ponerse en duda.

*Considerando:* que las obligaciones válidas y eficazmente contraidas tienen fuerza de ley para los otorgantes; y que para resolver cualquiera cuestión que se suscite acerca de su extensión y límites, es indispensable atenerse á las cláusulas y condiciones con que se celebraron, sin que pueda ser exigible ninguna otra que no haya sido expresamente pactada, á no ser aquellas que son naturales de los contratos, si no se estipula lo contrario, lo que no aparece de autos, ni de las reglas, reglamentos é instrucciones de la Lotería y forma de sus billetes á ellas ajustadas.

*Considerando:* que si la Diputación por fuerza mayor, como fué el estado de guerra en que la Isla se encontraba, no pudo celebrar los sorteos, ni aún terminada aquélla, no es justo ni legal, que por esa razón, ni por ninguna otra, deje de devolver á los compradores de los billetes de los no llevados á cabo por ella vendidos y de cuyo importe dispuso, porque esa fuerza mayor, en el caso de autos, sólo le daba el derecho á obtener un plazo para el pago, ó verificar el sorteo, plazo que ha transcurrido con exceso; y por no encontrarnos en el de la pérdida de la cosa debida, cuyas prescripciones legales no son aplicables á la Diputación Provincial, es imprescindible la devolución del precio de los billetes de los sorteos suspendidos y no efectuados por ser legal la compra venta de billetes de la Lotería en la época en que esa compra y venta de éllos se efectuaba, por haber servido la cantidad de su importe para servicios de la Diputación.

*Considerando:* que siendo los repetidos billetes "valores del Estado" y títulos al portador", no hay que fijarse ni saber si fueron obtenidos directamente de la Diputación ó de Agentes, por no reconocerse más dueño de ellos que la persona que lo presente, sin perjuicio de tercero, cuya declaración correspondía á los Tribunales ordinarios, incumbiendo á la Administración el reconocimiento oficial, en los casos de rotura, deterioro y averiguar si reunían ó nó los requisitos y medidas tomadas para evitar su falsificación, y pagar los premios no caducados en el término que la Diputación fijó en sus acuerdos; siendo uno de estos acuerdos para asegurar la venta, expender un determinado número por acciones á personas que recibían los billetes de cada acción, cumpliendo las condiciones que la Corporación había determinado,

game or one not legally permitted, although the characterization hereinbefore set forth and inherent thereto could not be eliminated or set-aside.

II.—Inasmuch as the administration and the Government have treated it as an income similar to other revenues, that is to say, a business operated by both for the porpose of obtaining sufficient revenues to cover their expenses, it is not possible, so long as it was not prohibited by the Government, to apply to acts which took place prior to the prohibition the reasonings upon which the prohibition is now based, not only because the law cannot have a retroactive effect, but also because no one can be. allowed to enrich himself to the prejudice of another person exercising a legitimate right under the protection of the law and the administration by virtue of which the tickets are delivered, their value received for the purpose of carrying out the drawings, and pay the prizes drawn, without which solemn obligation, the tickets would have been worthless, and sought by nobody.

III.—The tickets of the National Lottery were and are still considered in the Península as Government paper payable to bearer; those who counterfeit, amend or alter them being amenable to the provisions of the Penal Code; and pursuant to said legal provision, the tickets of the Provincial Lottery were similarly considered and subject to the same penal prescriptions in aforesaid cases, all of which shows that, being of the same nature, their value should be reimbursed by the Administration, since the drawings to which they refer did not take place.

IV.—He who, availing himself of a contract, demands the delivery of the price, virtually recognizes the validity thereof; and as the aleatory contract of chance entered into was not in violation of the express provisions of any prohibitory law in force at the time, its validity cannot be questioned.

V.—Valid obligations efficaciously contracted have the force of law upon the contracting parties, and to decide any question that may arise as to the scope and limits thereof the clauses and conditions under which they were entered into must be abided by, and compliance with no others can be enforced except such as have been expressly stipulated, save such as naturally appertain to contracts, unless otherwise agreed, and this does not appear from the record to be the case nor from the rules, regulations and instructions governing the lottery, and the form of the tickets issued in conformity therewith.

VI.—If, owing to *force majeure*, such as the state of war the Island was in, or even after the termination of the war, the "Diputación" was unable to effect the drawings, it is neither just nor lawful that for this or any other reason it should fail to return to purchasers of tickets, whereof the drawings did not take place, the money it had received from them and disposed of, because said *force majeure*, in the case at bar, only entitled it to an extension of time, either to reimburse said money or hold the drawings, which term of

quedando el resto de los billetes para el expendio al público por la dirección de Loterías en su oficina, prévia entrega de los de apartado. ·

*Considerando:* que el único que por error material fija el 5 de Abril de 1898 en la lista que acompaña del sorteo número 2, es Don Luis Chevremont; pero en su escrito con juramento expresa que los billetes son de los dos últimos sorteos, y por lo tanto no pueden ser de la fecha que la lista indica, tanto más cuanto que los comisionados no afirman que los billetes fueron de un sorteo de 5 de Abril, que no ha existido ni podido existir, porque jugándose la Lotería en sorteos cada veinte días, siendo el número 382 del 20 de Mayo, los de Abril se efectuaron el diez y el treinta de este mes por precisión, por ser ese el acuerdo tomado para los sorteos, y porque del anuncio del sorteo número 382 Gaceta de esta Isla de 5 de Mayo suspendiendo el sorteo se deduce, deduciéndose además del anuncio de 24 de Junio y del de 3 de Agosto, publicado en la ''Gaceta de Puerto Rico'', expresando que los sorteos extraordinarios á que el billete del número 2 se refiere, tenían que efectuarse el 5 de Agosto, pues el primero se efectuó el 15 de Julio y. lo declara dicho anuncio.

*Considerando:* que ese error material en la lista de billetes por Chevremont presentada no es de atenderse dado lo expuesto, y por poderse comprobar con los billetes presentados que son los reclamados, error material que no es aplicable á los demás reclamantes, porque ninguno de ellos ha incurrido en él, y por no ser equitativo, justo ni legal dar valor á un error material.

*Considerando:* que en los anuncios publicados en las Gacetas de 5 de Mayo y 4 de Agosto del 98, publicados por la Diputación Provincial suspendiendo los sorteos ordinarios números 382 y dos extraordinarios, declara válidos los billetes vendidos y que tendrán toda su eficacia para el que se celebre y anunciará, lo cual implica esa venta el derecho á ser reintegrados del valor de los mismos ó á pagar los premiados si los sorteos se hubieran efectuado; y por ello deben ser pagados esos billetes, no pudiendo este Tribunal ocuparse del valor de las dos cartas de pago números 11 y 40, de sumas depositadas para responder á dos acciones de billetes que presentó Rivera y Ca., por no venir resuelta esta cuestión por la Oficina Liquidadora, por haberse desglosado en 11 de Junio último para unirlas al expediente formado para el pago de la segunda parte de la reclamación de Rivera y Ca., demostrándolo la comunicación que se le pasara y se acompaña con la demanda, en la que se lee se ha resuelto la primera parte de la reclamación número 2, y por no haberse hecho sobre ese punto pretensión expresa en la demanda.

*Considerando:* que no puede sentarse exista temeridad en las partes que han intervenido en este juicio. Vistos los anuncios de la Gaceta citados, los Reglamentos, instrucciones y reglas de la Lotería que deben tenerse presentes, los artículos 1 al 6, 16, 343, 345, 430, 433, 1088 á 1091, 1094, 1119, 1123, 1124, 1216, 1218, 1254 á 1258, 1790, 1798 del Código Civil, las

extension has more than expired.    And as it is not a case of the loss of property due, the legal provisions in regard to which are not applicable to the "Diputación Provincial", a reimbursement must be made of the price of the tickets whose drawings were postponed and did not take place, inasmuch as the purchase of lottery tickets was legal at the time said purchase was made, because the sums received from the sale thereof were used to pay the expenses of the "Diputación".

VII.—The aforesaid tickets being considered as government paper "payable to bearer", no need was there to ascertain whether they had been obtained directly from the "Diputación" or from agents, the bearer being recognized as the sole owner thereof, without prejudice to third parties, which latter declaration was the province of the ordinary Courts; it being the duty of the Administration to make an official examination in cases of torn or damaged tickets, to ascertain whether or not the requirements and measures adopted to guard against conterfeit, had been complied with, and to pay the prizes within the term prescribed by the "Diputación"; one of these measures being for the purpose of ensuring the sale of tickets, to dispose of a certain number by allotment to regular customers, who complied with the terms imposed by the Corporation, while the remaining tickets were left for sale to the public by the Director of Lotteries at his office, after the delivery of the reserved tickets had been made.   The only one of the claimants who through error mentioned in the accompanying list April 5, 1898, as the date of drawing No. 2, was Luis Chevremont, but in his sworn petition he stated that the tickets appertained to the two last drawings, and therefore the date could not be the one mentioned in the list, especially when the commissioners did not assert that the tickets belonged to a drawing to be held April 5th, which is not and could not be the case, because said drawings took place every twenty days, and No. 382 being fixed for May 20th, those for April had necessarily to be held on the 10th and 30th of said month, this being the resolution adopted for holding drawings; and because this was to be inferred from the notice published in the "Gazette" of this Island, under date of May 5th, announcing the suspension of drawing No. 382, and the notice which appeared in the Porto Rico "Gazette", under the date of June 24th, and August 3th, stating that the extraordinary drawing to which the tickets of No. 2 referred, had to be held August 5th, the former having taken place on July 15th, as declared in said notice.  The immaterial error appearing in the list of tickets presented by Chevremont should not be taken into account for the foregoing reasons, and because said error is made evident by the tickets themselves, upon which his claim is based, and as it has not been incurred by any of the other claimants, it would not be equitable, just nor legal to attach importance to such an immaterial error.   In the notices published by the "Diputación Provincial" in the "Gazettes" of March 5th, and August 4,

Ordenes Generales números 17 de 29 de Noviembre de 1898 y número 84 de 18 de Abril de 1900, y en especial la doctrina del Consejo de Estado al resolver las apelaciones contenciosa-administrativas de 28 de Marzo de 1871, 21 de Abril de 1873, 13 de Julio de 1874 y 19 de Enero de 1889.

*Fallamos:* que debemos declarar y declaramos con lugar la demanda interpuesta por los nueve acreedores ó dueños de los billetes y décimos de billetes de la Lotería Provincial de esta Isla, mencionados en el encabezamiento de esta sentencia, cuya numeración consta de las facturas ó listas, y cuyos billetes y décimos obran en poder de la Comisión Liquidadora de la Diputación Provincial, correspondientes unos al sorteo ordinario número 382, que debió jugarse el 20 de Mayo de 1898, y los otros al sorteo extraordinario número 2, que debió celebrarse el 5 de Agosto de dicho año, correspondiendo este último al anuncio de 24 de Junio publicado en la "Gaceta de Puerto Rico" por la Diputación Provincial, en dicho mes, y suspendidos dichos sorteos según los anuncios de la "Gaceta" de 5 de Mayo y 3 de Agosto, condenándose al pago del importe de dichos billetes á la Administración, sin especial condena de costas; y firme esta sentencia, remítase de ella copia al Contador General por conducto del Honorable Gobernador, como prescribe el párrafo 6? de la Orden General número 84 citada. Así por esta nuestra sentencia, lo pronunciamos, mandamos y firmamos. Juan R. Ramos, Juan Morera Martinez, Jesús Romeu, Ramón Falcón.

*Resultando:* que notificada la sentencia al Letrado Don Antonio Alvarez Nava, al día siguiente de su pronunciamiento, ó sea en 5 de Octubre de 1901, y al Honorable Attorney General en 3 de Diciembre del propio año, el Fiscal interpuso recurso de apelación que fué admitido en ambos efectos habiendo sido emplazadas las partes en 13 y 17 de Diciembre citado.

*Resultando:* que recibidas las actuaciones en esta Corte Suprema, por providencia de 24 de Enero siguiente se tuvo por personados al Honorable Attorney General y al Letrado Don Antonio Alvarez Nava, que respectivamente comparecieron, el primero, en 15 de Enero, y el segundo, en 18 de Diciembre anterior, siendo de notar que el Letrado Don Antonio Alvarez Nava, en el escrito de comparecencia, manifestó que se adhería al recurso, sin que hiciera igual manifestación al evacuar el trámite de instrucción.

Abogado del apelante: *Sr. Harlan*, Attorney General.

Abogado de los apelados: *Sr. Alvarez Nava*.

1898, announcing the suspension of regular drawing No. 382 and extraordinary drawing No. 2, the tickets sold are declared valid for the postponed drawings which in due course would be announced and carried out. This implies the obligation to reimburse the value of said tickets or to pay the prizes in case the drawings took place, and therefore these tickets should be made good. As to the two receipts Nos. 11, and 40, presented by Rivera & Co. for sums deposited as security for two allotments of tickets, inasmuch as this question has not been decided by the Liquidating Office, said receipts having been separated on the 11th of last June, from the record, for the purpose of attaching them to the papers in the proceedings had in connection with the second part of Rivera & Co.'s claim, as is shown by the communication addressed to him and filed with the complaint, wherein it is stated that the first part of claim No. 2, had been decided; and because no express claim having been made upon this point in the complaint, this Court can not consider the value of the aforesaid receipts. No temerity can be declared to have been evinced by the parties to this action. In view of the said announcements made in the "Gazette"; of the Instructions and Rules and Regulations governing Lottery; articles 1 to 6, 16, 343, 345, 430, 433, 1088 to 1091, 1094, 1119, 1123, 1124, 1216, 1218, 1254 to 1258, 1790, 1798, of the Civil Code; General Orders No. 17, of November 29, 1898, and No. 84, of April 18, 1900, and particularly the doctrine of the Council of State, in deciding the appeals of administrative matters, of March 28, 1871, April 21, 1873, July 13, 1874, and January 19, 1889, we adjudge that we should and do sustain the action brought by the nine creditors or owners of tickets of the Provincial Lottery of this Island, mentioned at the commencement of this decision, the numeration whereof is set forth in the invoices or lists now in the possession of the Liquidating Commission of the "Diputación Provincial", some of these tickets appertaining to regular drawing No. 382, which should have been held on May 20, 1898, and the others to extraordinary drawing No. 2 to have taken place on August 5th, same year, according to the notice published by the "Diputación Provincial" in the "Gazette" of Porto Rico, under date of June 24th, which drawings were postponed according to notices in said "Gazette" of May 5th and August 3rd and we adjudge the Administration to pay the value of said tickets, without special imposition of costs; and when this judgment becomes final an attested transcript thereof will be forwarded to the Auditor, through the Governor, as provided by paragraph 6, of General Order No. 84 herein before cited. Thus by this our judgment we pronounce, command and sign. Juan R. Ramos, Juan Morera Martinez, Jesús Romeu, Ramón Falcón.

Notice of the judgment having been served upon Antonio Alvarez Nava, Esq., on the day after the same was rendered, namely, October 5, 1901, and upon The Honorable,

EL JUEZ ASOCIADO SR. HERNÁNDEZ, después de exponer los hechos anteriores, emitió la siguiente opinión del Tribunal:

*Aceptando* en lo sustancial los fundamentos de hechos y los de derecho preinsertos, ménos el primero de los de derecho, en cuanto parece establecer que el juego de Lotería está prohibido por leyes del Congreso de los Estados Unidos, si bien es cierto que las leyes postales de dicho Congreso prohiben y penan la remisión y circulación, por correo, de billetes de Lotería.

*Considerando:* que al vender la Diputación Provincial de Puerto Rico los billetes de Lotería, de que se trata en este pleito, contrajo la obligación que le imponía el Reglamento de la materia de celebrar los sorteos correspondientes, y al no hacerlo así, por incumplimiento de esa obligación, nació para los tenedores de dichos billetes, el derecho á que se les reintegre el precio que satisficieron, ya por exigirlo el principio altamente moral y jurídico de que nadie puede enriquecerse en perjuicio de otro, aplicable no solo á las personas, sino á toda entidad jurídica, ya por prevenirlo el precepto del artículo 1124 del Código Civil, al establecer que la facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe.

*Considerando:* que suprimida la Diputación Provincial por la Orden General No. 17, serie de 1898, en la que se ordenó que el Secretario de Hacienda se hiciera cargo del activo y pasivo de la misma, de la recaudación de todos sus créditos y liquidación de todas sus deudas, y creada por otra Orden General No. 84, serie de 1900, una Comisión Liquidadora para recibir, oir y resolver todas las reclamaciones contra aquel extinguido organismo, á fin de que los créditos, en forma reconocidos, fueran satisfechos á la mayor brevedad, es claro que al Gobierno de Puerto Rico corresponde pagar por medio de su Tesorero, en concepto de rein-

The Attorney General, on December 3rd, of the same year, the Fiscal took an appeal therefrom which was allowed both for the purposes of review and for stay of proceedings, the parties being cited to appear on the 13th and 17th of December aforesaid. The record having been received in the Supreme Court, the Hon. Attorney General and Antonio Alvarez Nava, Esq., by an order entered January 24th, of the following year, were held to have entered an appearance, they having appeared respectively on January 15, 1902, and December 18, 1901. And it should be noted that in the document entering an appearance Antonio Alvarez Nava, Esq., stated that he wished to prosecute the appeal, but failed to do so in his brief.

*Mr. Harlan, Attorney General,* for appellant.

*Mr. Alvarez Nava,* for respondents.

MR. ASSOCIATE JUSTICE HERNANDEZ, after making the above statement of facts, delivered the following opinion of the Court:

The facts and the legal propositions set forth in the foregoing judgment are accepted, save the first of the latter, in so far as it seems to affirm that the game of Lottery is prohibited by the laws of the Congress of the United States, although the postal laws of the United States do prohibit and punish the forwarding of lottery tickets through the mail. The "Diputación Provincial" of Porto Rico, in selling the lottery tickets which have given rise to this suit, contracted the obligation imposed by the regulation governing the matter of carrying out the drawings thereof, and having failed to do so, the non-fulfilment of that obligation entitles the holders of tickets to the reimbursement of the money paid by them, both because of the highly moral and juridical principle that no one should enrich himself to the prejudice of another, applicable not only to persons, but to every legal entity, and because it is so provided by article 1124 of the Civil Code which declares that the right to rescind the obligation is considered as implied where the

tegro, á los demandantes, las cantidades que reclaman como tenedores de billetes de la Lotería Provincial, cuyos sorteos no fueron celebrados oportunamente.

*Considerando:* que la sentencia condenando á la Administración al pago del importe de los billetes á que se contrae la demanda, sin especial condenación de costas y sin que haga mérito de la de intereses, no puede ser mejorada en beneficio de los apelados, según han pretendido éstos en el acto de la vista, pues para ello hubiera sido necesario que se hubieran adherido á la apelación, al evacuar el trámite de instrucción, no favoreciéndoles el haberlo hecho prematuramente al personarse ante esta Corte Suprema, pues ni antes ni después del expresado trámite puede utilizarse el recurso de adhesión, según terminantemente prescribe el Artículo 467 del Reglamento para la ejecución de la Ley de lo Contencioso-Administrativo.

*Fallamos:* que debemos confirmar y confirmamos la sentencia apelada que dictó el Tribunal de Distrito de San Juan, en 4 de Octubre de 1901.

Jueces concurrentes: Sres. Presidente, Quiñones, y Asociados, Figueras y Sulzbacher.

Juez disidente: Sr. MacLeary.

---

*Opinión concurrente del Juez Asociado Sr. Sulzbacher.*

El Sr. Juez Hernández, anunció la sentencia confirmatoria. Yo estoy de acuerdo con el resultado y con las conclusiones. Pero yo encuentro además otras razones para estar conforme con dicha sentencia, y creo muy conveniente manifestarlas. Con este fin repetiré brevemente los hechos del pleito.

Es el presente un recurso de apelación, interpuesto por el

same is mutual, in case one of the obligated persons does not comply with what is incumbent upon him. The "Diputación Provincial", having been abolished by General Order No. 17, Series of 1898, in which it was ordered that the Secretary of the Treasury should take charge of the assets and liabilities and collect all the credits and liquidate all the debts thereof, and a Liquidating Commission having been created by General Order No. 84, Series of 1900, to receive, hear and decide upon all claims against the said late "Diputación Provincial", in order that such debts as were duly acknowledged might be paid as speedily as possible, it is evident that it devolves upon the Government of Porto Rico, through its Treasurer, to pay by way of reimbursement, the sums claimed by plaintiffs as holders of tickets of the Provincial Lottery the drawings of which did not take place in due time. The decision adjudging the Administration to pay the value of the tickets specified in the complaint, without special imposition of costs and taking no account of the interest, cannot be amended for the benefit of respondents as requested by them at the hearing, because for this purpose they should have signified their desire to continue the prosecution of the appeal when the papers were submitted to them; nor can the fact of their having prematurely done so on entering an appearance in the Supreme Court, be of any benefit to them, inasmuch as this cannot be done either before or after the aforesaid step in the proceedings as is expressly provided in Article 467 of the Regulation for the execution of the Law of Litigative-Administrative matters. We adjudge that we should affirm and do affirm the judgment rendered by the District Court of San Juan, on October 4, 1901.

Messrs. Chief Justice Quiñones and Associate Justices Figueras and Sulzbacher, concurring.

Mr. Associate Justice MacLeary, dissenting.

*Concurring Opinion of Mr. Associate Justice Sulzbacher.*

Mr. Associate Justice Hernández has announced the

Tesorero de Puerto Rico contra la sentencia dictada por el Tribunal de Distrito de San Juan, en el pleito promovido por Don Luis Chevremont y otros, contra el Tesorero de Puerto Rico. para recuperar ciertas sumas de dinero pagadas por ellos, respectivamente, á la Diputación Provincial, por varios billetes de loterías. Se falló el pleito por dicho Tribunal de Distrito, sobre la base de los hechos, según constaban en la demanda y en la contestación. Estos hechos son sustancialmente como sigue : En el año de 1876, el Gobierno de España autorizó á la Diputación Provincial de Puerto Rico, para sostener un sistema de lotería, y éste se estableció en el año de 1877. Bajo dicho sistema, el 25 por ciento de las entradas procedentes de la venta de billetes de lotería, pertenecía á dicha Diputación Provincial, como beneficios y ganancias, y el resto, de 75 por ciento, había de repartirse entre los tenedores de los billetes premiados ; y los billetes se vendieron, por la Diputación Provincial, á razón de dos pesos cuarenta y dos centavos cada uno. Cierto sorteo debía haberse efectuado el 29 de Mayo de 1898 ; pero á causa de la guerra con los Estados Unidos, no fué posible vender suficiente número de billetes, y se aplazó el sorteo hasta el mes de Julio de 1898. La Diputación Provincial, con motivo de encontrarse muy necesitada de fondos, ordenó que se efectuase un nuevo sorteo el día 5 de Agosto, reduciendo la venta de billetes de treinta mil á diez mil. A causa de la ocupación de la isla por las tropas Americanas, no se efectuaron ni uno ni otro de dichos sorteos, siendo los demandantes tenedores de billetes vendidos para dichos sorteos. Por la Orden General No. 17 de 19 de Noviembre de 1898, quedó disuelta y abolida la Diputación Provincial, y por la Orden General No. 84, de 18 de Abril de 1900, se nombró una comisión para que recibiera, examinara y resolviera todas las reclamaciones contra la extinguida Diputación. Los demandantes presentaron oportunamente sus reclamaciones ante dicha Comisión que las rechazó. De conformidad con la ley, los reclamantes pro-

affirmative opinion of the Court.   I concur in the result and conclusions.   But I find additional reasons to agree with said opinion and I think it advisable to state them. For this purpose I shall briefly repeat the facts of the case.

This is an appeal taken by the Treasurer of Porto Rico, from the judgment rendered by the District Court of San Juan in the action brought by Luis Chevremont and others, against the Treasurer of Porto Rico, to recover certain sums of money paid by them, respectively, to the "Diputación Provincial", for lottery tickets.   The case was decided by the said District Court upon the basis of the facts as they appeared in the complaint and the answer thereto.   These facts are substantially as follows:   In the year 1876, the Government of Spain authorized the "Diputación Provincial" of Porto Rico to maintain a system of lottery, and this was established in the year 1877.   Under the said system twenty five per cent of the receipts from the sale of lottery tickets accrued as profit or earning, to the said "Diputación Provincial", while the remaining seventy five per cent was to be distributed among the holders of tickets that had drawn prizes; and the tickets were sold by the "Diputación Provincial" at two *pesos* and forty-two *centavos* each.   A certain drawing was to have taken place on May 29, 1898, but owing to the war with the United States, a sufficient number of tickets could not be sold, and the drawing was postponed to July, 1898. The "Diputación Provincial", being in need of funds, ordered another drawing for August 15th, reducing the number of tickets from thirty thousand to ten thousand.   Owing to the occupation of the Island by the American troops, neither of these two drawings took place, and the plaintiffs are holders of tickets sold for the said drawings.   By General Order No. 17 of November 19, 1898, the "Diputación Provincial" was dissolved and abolished and by General Order No. 84, of April 18, 1900, a Commission was appointed to receive, examine and decide all claims against the late "Diputación".   The plaintiffs in due time present-

movieron ante el Tribunal de Distrito de San Juan, un pleito contencioso-administrativo, cuyo pleito fué dirigido contra la Administración ó el Tesorero. El Tribunal de Distrito dictó sentencia á favor de los demandantes, y contra el Tesorero de Puerto Rico, contra cuya senten- cia este último apela ante este Tribunal. Ninguna de las partes ha presentado ante este Tribunal escrito de ale- gaciones, y sólo en el acto de la vista han expuesto oralmente lo que les ha parecido conducente á la de- fensa de sus derechos. La demanda y la contestación contienen alegaciones y principios de derecho, que las partes consideran como aplicables en apoyo de sus pretensiones. Las partes convienen en que, en virtud del párrafo 6 de la Orden General número 84, el Tribunal de Distrito tiene competencia sobre la controversia por el procedimiento con- tencioso-administrativo. El demandante funda su derecho de entablar la demanda, en los artículos 1091 y 1124 del Código Civil, sosteniendo, según parece, que la venta de bi- lletes fué un contrato entre la Diputación Provincial y los tenedores de billetes de lotería, y afirmando que en virtud de dicha sección 6 de la Orden General número 84, existe á favor de los demandantes un derecho ó motivo para proce- der contra el demandado ó sea el Tesorero. El demandado afirma que la lotería es una institución que está prohibida por las leyes actualmente vigentes; que el tenedor de un bi- llete de lotería es un jugador que expone su dinero al azar de la fortuna; que las leyes de España no previenen qué re- curso especial debería tener el tenedor de un billete de lote- ría, si el sorteo no hubiese podido efectuarse. Que se ven- dían los billetes en la Isla y en el extrangero á un precio más alto que el que había pagado el primer comprador; pero que los billetes de lotería eran un artículo de comercio, y que una vez emitidos por la Diputación Provincial ésta no tenía más que ver con los mismos. Que es evidente que la Diputación Provincial, no tenía que reembolsar al tenedor de los billetes de lotería, el precio de compra de dichos bille-

ed their claims to the said Commission which refused to allow them. In conformity with the law, the claimants instituted in the District Court of San Juan a "litigative-administrative" action directed against the Administration or the Treasurer. The District Court of San Juan rendered judgment in favor of the plaintiffs and against the Treasurer of Porto Rico, from which decision the latter appeals to this Court. Neither of the parties has filed a brief in this Court, and only at the hearing have they presented such oral arguments as were deemed conducive to the defense of their rights. The complaint and answer contain allegations and principles of law which the parties consider applicable in support of their claims. The parties agree that pursuant to paragraph 6, of General Orders No. 84, the District Court has jurisdiction of the case under the proceeding known as "Contencioso-Administrativo" ("Litigative-Administrative") proceeding. The plaintiffs base their right of action on articles 1091 and 1124 of the Civil Code, maintaining, as it appears, that the sale of tickets was a contract between the "Diputación Provincial" and the holders of lottery tickets, and contend that by virtue of said Section 6, of General Orders No. 84, the plaintiffs have a cause of action against the defendant, that is to say, the Treasurer. The defendant contends that the lottery is an institution prohibited by the laws at present in force; that the holder of a lottery ticket is a gambler who exposes his money to the hazards of fortune; that the laws of Spain do not afford any special remedy to the holder of a lottery ticket, in case the drawing could not take place; that the tickets were sold in the Island and in foreign countries at a higher price than had been paid by the first purchaser; that lottery tickets were articles of commerce, and after being issued by the "Diputación Provincial" the latter had nothing further to do with them; that it was evident that the "Diputación Provincial" was not obliged to reimburse to the holder of lottery tickets the purchase money of said

tes, y que esto nunca se había supuesto; y que, aún admitiendo que la Diputación Provincial hubiera tenido que restituir el precio de compra de los billetes, si con motivo de guerra ó fuerza mayor no hubieran podido efectuarse los sorteos, no debía haber en ningún caso responsabilidad por parte del Tesorero de Puerto Rico.    Nos encontramos por lo tanto frente á tres problemas que resolver: *Primero* ¿ Era legal la lotería en Puerto Rico, en la época de la venta de los billetes? *Segundo* ¿ Cuándo los billetes habían sido legalmente adquiridos, qué recursos tenían los tenedores de billetes para hacer valer sus derechos contra la Diputación Provincial, en el caso de que no se efectuaran los sorteos?; y *Tercero* ¿ Si la Diputación Provincial era responsable para con los tenedores de billetes, existe actualmente responsabilidad alguna por parte del Tesorero de Puerto Rico? En los Estados Unidos, durante muchos años, se han considerado las loterías como un mal en detrimento de la sociedad; y ya en el año 1850, el Tribunal Supremo de los Estados Unidos expresó sus ideas sobre esta materia en los términos siguientes:

"Este Tribunal hace muchos años, tuvo ocasión de decir que las formas ordinarias de juego eran comparativamente inocentes, al compararlas con la corrupción de loterías tan generalizada; que las primeras estaban limitadas á algunas personas y lugares, en tanto que las últimas invadían toda la comunidad, entrando en cada habitación, alcanzando á todas las clases, robando los jornales duramente ganados por los pobres, y saqueando á los ignorantes y cándidos".

*Phalen* contra *Virginia* 49 E. E. U. U. 8.    How 163.

Sin embargo, en la misma época, más ó menos, cuando el Gobierno de España autorizó á la Diputación Provincial de Puerto Rico, para establecer un sistema de lotería, la Constitución de Kentucky permitió juegos de loterías en aquel Estado.    Cuando la Legislatura más tarde promulgó una ley prohibitoria contra la lotería, los propietarios de la lotería acudieron á los Tribunales, y se llevó el pleito ante el Tribunal de Apelaciones de dicho Estado; y allí nos encontramos con las siguientes expresiones:

"Por lo tanto, aunque la legislatura tiene el poder de revocar la concesión

tickets, and this had never been contemplated; and that, even admitting that the "Diputación Provincial" was bound to return the purchase money of the tickets, if, through war or *force majeure*, the drawings could not take place no responsibility, in any event, could attach to the Treasurer of Porto Rico. Thus we have before us three problems to solve: *First.* Was lottery legal in Porto Rico at the time the tickets were sold? *Second.* When the tickets had been legally acquired, what recourse had holders of tickets to make good their rights against the "Diputación Provincial", in case the drawings were not held? And *Third.* If the "Diputación Provincial" was responsible to the ticket holders, does there exist any responsibility on the part of the Treasurer of Porto Rico? In the United States, for many years, lotteries have been considered detrimental to society, and since the year 1850, the Supreme Court of the United States gave expression to its opinions upon the subject in the following terms:

"Many years ago this Court had occasion to say that the common forms of gambling are comparatively innocuous when placed in contrast with the wide-spread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community; it enters every dwelling; it reaches every class; it prays upon the hard earnings of the poor; it plunders the ignorant and simple". *Phalen* v. *Virginia*, 49 U. S. Howard 163.

However, at about the same time the Spanish Government authorized the "Diputación Provincial" of Porto Rico to establish a system of lottery, the Constitution of Kentucky permitted games of lottery in that State. When, later, the Legislature passed a law prohibiting lottery the proprietors of the lottery applied to the Courts and the case was taken to the Court of Appeals of said State, and there we find the following declarations:

" Although, therefore, the Legislature has the power to repeal the grant of a lottery privilege where no rights have accrued under it, and though lotteries have a demoralizing tendency and exercise a very pernicious influence over the ignorant and credulous part of the community, and for this reason

de un privilegio de lotería, cuando no hayan resultado derechos de su concesión, y aunque las loterías tengan una tendencia desmoralizadora, y ejerzan una influencia muy perniciosa sobre las clases ignorantes y crédulas de la comunidad, y por esta razón hayan sido denunciadas casi universalmente por el poder legislativo en los diferentes Estados de la Unión: sin embargo, si se han adquirido derechos ó incurrido en responsabilidades, fundados en la buena fé que se tenía en el privilegio conferido por la concesión, sería manifiestamente injusto el permitir que tales derechos fuesen destruídos por una revocación Legislativa del privilegio.    Por lo tanto, si bajo la presente concesión, se han adquirido cualesquiera derechos antes de la promulgación de la ley que los revoca, entonces deberá considerarse la citada ley como inconstitucional é ineficaz, por lo menos, en cuanto á lo concerniente á dichos derechos".

Estas conclusiones fueron sancionadas por el Tribunal Supremo de los Estados Unidos, en el pleito de Douglass contra Kentucky, 168 Estados Unidos 499.

Más tarde, cuando el mismo Estado, por su constitución, prohibió la lotería, el propietario de ésta reclamó derechos que estimaba haber adquirido, y el mismo Tribunal falló en contra del querellante en los términos siguientes:

"Por lo tanto, cualquiera persona que acepte un privilegio de lotería, lo hace en la tácita inteligencia de que el pueblo, en su carácter soberano y por sus Autoridades debidamente constituídas, puede revocarlo en cualquiera época, cuando lo exigiere el bien público, sea que se pague ó nó, por dicho privilegio.    Todo lo que una persona puede obtener por tal privilegio es la suspensión de ciertos derechos gubernamentales á su favor, cuya suspensión está sujeta á ser retirada á voluntad del Gobierno.    Dicha persona, en cuanto al efecto legal, no tiene nada más que el permiso de disfrutar el privilegio bajo las condiciones expresadas, por el período de tiempo especificado, á menos que sea derogada con anterioridad, por el poder soberano del Estado.    Es un permiso que es válido contra las leyes vigentes, pero que está sujeto á futura inspección legislativa y constitucional, y á ser revocado."

*Douglass* contra *Kentucky* (Supra.)

Pero con respecto á derechos adquiridos por un acreedor, contra el propietario de la lotería, encontramos en la misma decisión una doctrina muy diferente, y como emana del Tribunal más alto, debe aceptarse dicha doctrina hoy, como ley vigente en el país.

"Todos los derechos adquiridos sobre la base de la buena fé de una con-

have been almost universally denounced by the lawmaking power in different States of the Union, yet if rights have been acquired or liabilities incurred upon the faith of the privilege conferred by the grant, it would be obviously unjust to permit such rights to be divested by a legislative revocation of the privilege. If, therefore, any vested rights have been acquired under the present grant before the passage of the repealing law, then, to the extent of such rights at least, the law must be regarded as unconstitutional and inoperative".

These conclusions were sanctioned by the Supreme Court of the United States in the case of *Douglass* v. *Kentucky*, 168 United States, 499. Later on, when the same State, by its Constitution, prohibited lottery, the proprietor thereof alleged rights which he claimed to have acquired, and the same Court rendered an opinion against the plaintiff in the following terms :

"Any one, therefore, who accepts a lottery charter does so with the implied understanding that the people, in their sovereign capacity and through their properly constituted agencies, may resume it at any time when the public good shall require, whether it be paid for or not. All that one can get by such a charter is a suspension of certain governmental rights in his favor, subject to withdrawal at will. He has in legal effect nothing more than a license to enjoy the privilege on the terms named for the specified time, unless it be sooner abrogated by the sovereign power of the State. It is a permit, good as against existing laws, but subject to future legislative and constitutional control or withdrawal". *Douglas* v. *Kentucky* (*et supra*).

But with respect to rights acquired by a creditor against the proprietor of the lottery, we find in the same decision a very different doctrine, and as it emanates from the highest Court, the said doctrine must now be accepted as the law in force in the country.

"All rights acquired on the faith of a lottery grant must be deemed to have been acquired subject to the power of the State to the extent just indicated; nevertheless, rights acquired under such a grant consistently with the law as it was when they were so acquired, and which rights may be exercised and enjoyed without conducting a lottery forbidden by the State, are, of course, not affected, by the revocation of such grant". *Douglas* v. *Kentucky* (*et supra*) State v. Mississippi, 191, United States.

We also read in the Encyclopedia of Law :

cesión de lotería, deben considerarse como adquiridos con sujeción al poder del Estado, hasta el punto que acaba de indicarse; sin embargo, los derechos que bajo tal concesión se hayan adquirido, conforme á la ley, tal como ésta fué, cuando dichos derechos fueron adquiridos en la forma indicada, y cuyos derechos se pueden ejercer y disfrutar sin ocuparse en empresas de loterías que están prohibidas por el Estado, no son, por supuesto, afectados y no podían serlo, por la revocación de tal concesión."

*Douglass* contra *Kentucky* (Supra) *Estado* contra *Mississipi*, 191, E. E. U. U.

### También leemos en la Enciclopedia de Leyes:

"En una época no muy remota, las loterías fueron toleradas y usadas por los Gobiernos de los Estados, como medios para obtener rentas para fines gubernamentales, caritativos y de educación."

"Posteriormente, se han promulgado leyes que declaran ilegal la compra y venta de billetes de lotería, prohibiendo el uso del correo para fines de lotería, y tratando la lotería, cuando menos tan desfavorablemente como cualquiera otra clase de contratos de juego."

"En la mayor parte de los Estados hay disposiciones legales que prohiben las loterías y también, en algunos casos, la venta de billetes de lotería. En Inglaterra, Canadá, y en todos los Estados de los Estados Unidos, con una excepción, las loterías están prohibidas por la ley."

Pero siempre que las loterías estaban sancionadas en los diferentes Estados, eran consideradas como transacciones legales al extremo que, en el Estado de Delaware, la venta de billetes de lotería, sin licencia, era una falta punible.

Por consiguiente vemos que, en tiempos pasados, el Pueblo de los Estados Unidos estaba tan ansioso de buscar su fortuna mediante esta maquinación de riesgo y azar, como lo estababa el Continente Oriental; y las loterías no eran restringidas ni reprimidas, hasta que el Congreso de los Estados Unidos prohibió el envío de billetes de loterías por el correo, declarando que tal envío constituía un delito.

No existe ley alguna por la cual el Gobierno de España, con anterioridad al Tratado de Paz celebrado entre los Estados Unidos y el Reino de España, haya tomado medida alguna para suprimir la lotería en Puerto Rico. Podemos, por lo tanto, resolver el primer problema afirmativamente; á saber: que en Puerto Rico la lotería era una transacción

"Not very long ago lotteries were tolerated and made use of by the government of the States as a means of raising revenue for governmental, charitable and educational purposes".

"Of late, laws have been promulgated declaring the purchase and sale of lottery tickets to be illegal, prohibiting the use of the mail for lottery purposes, and treating lottery, at least as unfavorably as any other class of gambling contracts".

"In most of the States there are constitutional provisions prohibiting lotteries and sometimes the sale of lottery tickets also. In England, Canada, and all the States of the United States with one exception, lotteries are prohibited by statutes".

But whenever lotteries were sanctioned in the various States, they were held to be legal transactions, so much so that in the State of Delaware the sale of lottery tickets, without licence, was a punishable offense.

Thus we see that in times past the people of the United States were as anxious to seek their fortune by means of this contrivance of risk and hazard as were those of the Eastern Continent, and lotteries were not restricted nor repressed until the Congress of the United States prohibited the forwarding of lottery tickets through the mail, and declared that such forwarding constituted a crime.

There exists no law whereby the Government of Spain, prior to the Treaty of Peace entered into between the United States and the Kingdom of Spain, had adopted any measure to suppress the lottery in Porto Rico. We can, therefore, decide the first question in the affirmative, namely, that the lottery in Porto Rico was a legal transaction at the time the aforesaid lottery tickets were sold, and that they had the character of current lottery tickets, valid in the hands of the holder. Our opinion in this respect is especially defined and affirmed by the statement of the Hon. Fiscal, representing the Treasurer of Porto Rico *"that lottery tickets were articles of commerce"*, which means that they were negotiable. A negotiable document, according to the laws of Spain and of the United States, implies that it was obtained for value received, and creates a res-

legal en la época en que los billetes de lotería de que se trata, fueron vendidos; y que tenían el carácter de billetes de lotería corrientes, válidos en manos del tenedor. Nuestra opinión en este respecto está especialmente definida y afirmada por la manifestación del Honorable Fiscal, representante del Tesorero de Puerto Rico *"de que los billetes de lotería eran artículos de comercio"*, lo cual quiere decir que eran negociables. Un documento negociable, según las leyes de España y las de los Estados Unidos, implica que fué obtenido por valor recibido, y crea una responsabilidad por parte del otorgante para con el tenedor. Se hubiera podido presentar ante el *Tribunal sentenciador* una alegación negando lo anteriormente expuesto; pero los autos no revelan que se haya sostenido, en forma alguna, semejante pretensión. El segundo problema es *"¿qué recurso ó medio tenía el tenedor de un billete para hacer valer sus derechos contra la Diputación Provincial en el caso de que no se efectuaran los sorteos?"* El demandante sostiene que, en virtud de la compra de billetes de lotería, existió entre la Diputación Provincial y el tenedor del billete un contrato, y este contrato debe haber sido el de que, por causa del pago del valor del billete, la Diputación Provincial convino en efectuar un sorteo, reteniendo veinticinco por ciento del producto de la venta de los billetes como beneficios y ganancias y dar así al tenedor del billete una oportunidad para perder su dinero, pero también para ganar una suma más ó menos grande, y aún un capital. La transacción debía por lo tanto considerarse como un legítimo juego de dinero, contrato aleatorio ó apuesta, y aún como un contrato de juego sancionado por la Suprema Autoridad. Los demandantes hacen referencia á los artículos 1091, y 1124 del Código Civil, que son los siguientes:

"Artículo 1091.—Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos".

"Artículo 1124.—La facultad de resolver las obligaciones, se entiende

ponsibility on the part of the maker with respect to the holder. A plea rebutting the foregoing statement could have been presented at the *trial. Court*, but the record does not show that such a claim has in any manner been urged. The second question is: "*When the tickets had been legally acquired what recourse had holders of tickets to assert their rights against the "Diputación Provincial", in case the drawings were not held?*" The plaintiff contends that by virtue of the purchase of lottery tickets, there existed a contract between the "Diputación Provincial" and the holder of the ticket, and this contract must have been that by reason of the payment of the value of the ticket, the "Diputación Provincial" agreed to effect a drawing, retaining twenty five per cent of the proceeds of the sale of tickets as a benefit or profit, and thus affording the holder of the ticket an opportunity to not only lose his money, but also to win a sum, more or less large, and even a capital. The transaction, therefore, should be considered as a legitimate game for money, an aleatory contract or bet, and even as a gaming contract sanctioned by the supreme authority. The plaintiffs refer to articles 1091 and 1124 of the Civil Code, which are the following:

"Art. 1091.—Obligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations".

"Art. 1124.—The right to rescind the obligations is considered as implied in mutual ones, in case one of the obligated persons does not comply with what is incumbent upon him".

"The person prejudiced may choose between exacting the fulfillment of the obligation or its rescission, with indemnity for damages and payment of interest in either case. He may also demand the rescission, even after having requested its fulfillment, should the latter appear impossible".

"The Court shall order the rescission demanded, unless there are sufficient causes authorizing it to fix a period".

We are always inclined to adduce the doctrines of American jurisprudence when applicable to judicial problems in the Courts of this Island, considering them as more progressive, and as an evolution of the old system. At the

implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe".

"El perjudicado podrá escoger entre exigir el cumplimiento ó la resolución de la obligación con el resarcimiento de daños y abonos de intereses en ambos casos; también podrá pedir la resolución aún después de haber optado por el cumplimiento, cuando este resultare imposible".

"El Tribunal decretará la resolución que se reclame, á no haber causas justificadas que le autorice para señalar plazos".

Siempre nos inclinamos á aducir las doctrinas de la jurisprudencia de los Estados Unidos, cuando son aplicables, á los problemas judiciales en los tribunales de esta Isla, considerando las mismas más progresivas y como una evolución del sistema antiguo. En la época en que las loterías y los contratos de juego eran tolerados en los diferentes Estados de la Uuión cuyas loterías y contratos los Tribunales estaban obligados á respetar se podía invocar el auxilio judicial para obligar á las partes al cumplimiento de los mismos. Bajo el derecho común, que es el orígen y fuente de las leyes de los Estados Unidos, los contratos de juego estaban reconocidos, y encontramos en la Enciclopedia de Leyes, lo siguiente:

"Según la ley común, las partes de los contratos de juegos sancionados por la Ley, podían hacerlos cumplir forzadamente, del mismo modo que cualesquiera otros contratos".

"Según la Ley Común, los contratos de juego, cuando eran justos y libres de engaño, fueron considerados por los Tribunales como válidos, sin distinción".

### CONTRADICCIONES DE LAS LEYES.

"Se sostiene, por lo tanto, que si la lotería es legal en el Estado en que se efectúa la venta de los billetes, dicha venta, ó los asuntos relacionados con la propiedad de tales billetes, dará lugar á una demanda aún en los Estados en que las loterías están prohibidas, aunque el vendedor supo que los billetes fueron usados con infracción de la terminante ley de otro Estado. *Jameson* contra *Gregory*, 4 Met. (Ky.) 363. *Mc Vight* contra *Biesecker*, 13 Pa. St. 328".

"Ley de equidad que obliga al Director de una lotería á adjudicar los premios á las personas que tengan derecho á los mismos. *Macgimpsey* contra *Booker*, 5 Yerg. (Tenn.) 139".

"Un error en el sorteo de la lotería es fatal, y la equidad exigirá que se efectúe un nuevo sorteo. *Madison* contra *Vaughan*, 5 Call (Va.) 562".

time when lotteries and gaming contracts were tolerated in the different States of the Union, which lotteries and contracts the Courts were bound to respect, judicial aid could be invoked for the purpose of compelling the parties to fulfill them. Under the common law which is the origin and source of the laws of the United States, gaming contracts were recognized, and we find in the Encyclopedia of Law, the following:

"Under the common law, parties to gaming contracts sanctioned by the law, could compel their fulfillment, as in the case of any other contracts".

"Under the common law, gaming contracts, when fair and free from deceit, were considered by the Courts as valid without distinction".

"*Conflict of Laws.*—It is usually held that if the lottery is legal in the state where the sale of tickets is made, such sale, or matters connected with the ownership of such tickets, will give rise to an action even in states where lotteries are prohibited, although the vendor knew that the tickets were to be used in violation of a positive law in another state.—*Jameson* v. *Gregory*, 4 Met. (Ky) 363. *McNight* v. *Biesecker*, 13 Pa. St. 328".

"Bill in equity to compel managers of lottery to adjudge prizes to persons entitled thereto.—*M'Gimpsey* v. *Booker*, 5 Yerg. (Tenn) 139".

A mistake in a lottery drawing is fatal, and equity will order that a redrawing be had.—*Madison* v. *Vaughan*, 5 Call. (Va.) 562".

In one of the States of the Union where bets on horse-races were legal, the Supreme Court of that State declared:

"One party may sue another for failure to comply with all the stipulations of the contract; as where persons agree to run their horses and make their wagers, a suit would lie to make good the note deposited as a forfeiture in case the race was not run.— *Grump* v. *Secrest*, 9 Texas, 260".

It would not be so if such contracts or agreements were prohibited by the laws because then the Courts of Justice could not be invoked, and the parties would remain in the situation in which they had placed themselves through their own fault. It is therefore, evident that even in the United States, in the absence of a law to the contrary, the party could have recovered his money by means of an action brought by reason of the rescission or non-fulfilment of a contract, or for money obtained and received. But we should

En uno de los Estados de la Unión en que apuestas sobre carreras de caballo eran legales, el Tribunal Supremo de aquel Estado declaró:

"Una parte podrá entablar demanda contra otra, por haber dejado de cumplir con todas las estipulaciones del contrato; como en el caso en que dos personas convienen en hacer correr sus caballos y hacen sus apuestas, habrá lugar á una demanda con motivo del pagaré dado en prenda por si no se realizare la carrera.    *Crump* contra *Secrest*, 9 Texas 260".

No sería así, si tales contratos ó convenios fuesen prohibidos por la ley: porque entonces no podrían invocarse los Tribunales de Justicia, y las partes se quedarían en la situación en que se hubieran colocado por su propia culpa.   Es por tanto, evidente que aún en los Estados Unidos, á falta de una ley en sentido contrario, la parte hubiera podido recuperar su dinero, por medio de una demanda entablada con motivo de la rescisión ó el incumplimiento de un contrato, ó por dinero obtenido y recibido.   Pero debemos primeramente considerar el presente caso de acuerdo con las leyes en vigor en Puerto Rico al venderse los billetes ó cuando la Diputación Provincial fué abolida.   La Diputación Provincial no cumplió su contrato; no verificó sorteos, y de acuerdo con los artículos del Código Civil arriba citados, era responsable de los daños que los demandantes hubieran podido reclamar durante el Gobierno Español ante la jurisdicción competente.   El montante de los daños y perjuicios no podía ser otro que el dinero pagado por los billetes con sus intereses.   Llegamos ahora al tercer punto.  *"¿Es el Tesorero de Puerto Rico en manera alguna responsable al tenedor de billetes de loterías"?*   El Honorable Fiscal, en representación del Tesorero niega que exista responsabilidad alguna, pero no ha dado razones para su negativa, ni ha citado ninguna ley ni principio alguno de jurisprudencia, mientras que los demandantes reclaman un derecho, de acuerdo con dichas Ordenes Generales, las cuales en virtud de una Ley del Congreso de los Estados Unidos, aprobada en Abril 12 de 1900, vinieron á ser leyes de Puerto Rico por nuevo decreto y

first consider the case at issue in accordance with the laws in force in Porto Rico at the time the tickets were sold, or when the "Diputación Provincial" was abolished. The "Diputación Provincial" did not fulfill its contract; it did not carry out the drawings, and under the articles of the Civil Code, cited above, it was responsible for damages which plaintiffs could have demanded during the Spanish Government, in a Court of competent jurisdiction. The amount of damages and losses could not be other than the money paid for the tickets, with interest thereon. We now come to the third point: *Is the Treasurer of Porto Rico in any manner responsible to the holders of lottery tickets?* The Hon. Fiscal, on behalf of the Treasurer, denies that there exists any responsibility, but he has given no reasons for his denial, nor has he cited any law or principle of jurisprudence, while the plaintiffs claim a right under the said General Orders which by virtue of an Act of the Congress of the United States, approved April 12, 1900, became laws of Porto Rico by new enactment, and are now in full force and effect. Section 8 of the said Act of Congress, known as "The Foraker Act", reads as follows :

"Section 8.—That the laws and ordinances of Porto Rico now in force shall continue in full force and effect, except as altered, amended, or modified hereinafter, or as altered or modified by military orders and decrees in force when this Act shall take effect, and so far as the same are not inconsistent or in conflict with the statutory laws of the United States not locally inapplicable, or the provisions hereof, until altered, amended, or repealed by the legislative authority hereinafter provided for Porto Rico or by Act of Congress of the United States".

We find that when the American Army occupied the Island, there existed in Porto Rico an institution known by the name of "Diputación Provincial". The said institution was a corporation, an administrative entity, distinct from the general administration representing the Royal Government of Spain. We are informed by the aforementioned General Order No. 84, that the said corporation owned a number of buildings, lands and personal property.

están hoy en toda su fuerza y vigor.    La sección 8 de dicha
Ley del Congreso conocida como "la Ley Foraker" dice lo
siguiente :

"Sección 8.    Que las leyes y ordenanzas de Puerto Rico actualmente en
vigor, continuarán vigentes, excepto en los casos en que sean alteradas, en-
mendadas ó modificadas por la presente; ó hayan sido alteradas ó modifica-
das por órdenes militares y decretos vigentes cuando esta Ley entre á regir,
y en todo aquello en que las mismas no resulten incompatibles ó en conflicto
con las leyes estatutarias de los Estados Unidos no inaplicables localmente,
ó con las presentes disposiciones, hasta que sean alteradas, enmendadas ó re-
vocadas por la autoridad legislativa creada por la presente para Puerto
Rico, ó por una Ley del Congreso de los Estados Unidos.

Nos encontramos con que al ocupar la Isla el Ejército
Americano, existía en Puerto Rico una institución que se
conocía bajo el nombre de "Diputación Provincial".    Di-
cha institución era una corporación, una entidad adminis-
trativa, distinta de la administración general que repre-
senta al Gobierno Real de España.    Según nos informa la
citada Orden General No. 84 dicha Corporación poseía un
número de edificios, tierras y bienes muebles.    Tenía su
Tesorero, pagaba sus gastos y recaudaba sus rentas.    Era
independiente del Gobierno General, en cuyo respecto po-
dría compararse con un Gobierno Municipal de la actuali-
dad ó como un Condado de los Estados Unidos el cual está
dirigido por sus propios funcionarios, tiene su tesoro y dicta
su Reglamento siempre que los mismos no se opongan á las
leyes generales del País.    Esta "Diputación Provincial",
esta Corporación estaba autorizada por el Gobierno Real de
España para el sostenimiento de un sistema de Lotería.    El
Gobierno Militar, en virtud de una orden No. 17 del 29 de
Noviembre de 1898, hizo cesar y disolvió la Diputación
Provincial, dividiendo sus propiedades y fondos entre otros
funcionarios y departamentos creados por dicha Orden Ge-
neral.    El Secretario de Hacienda, el Tesorero, se encargó
del activo y pasivo y de recaudar todas sus acreencias y li-
quidar sus deudas.    Se creó una comisión de acuerdo con
dicha Orden General, para fijar el activo y pasivo de la Di-

It had its treasurer, it paid its expenses and it collected its revenues. It was independent of the General Government, in which respect it might be compared with a municipal government of the present day, or with a county in the United States which is administered by its own officials, has its treasury, and makes its regulations, provided the same are not in conflict with the general laws of the country. This "Diputación Provincial", this Corporation, was authorized by the Royal Government of Spain to maintain a system of lottery. The Military Government, by virtue of General Order No. 17, November 29, 1898, declared the "Diputación Provincial" to be discontinued and abolished, and distributed its property and funds among other officials and departments created by the said General Order. The Secretary of the Treasury took charge of its assets and liabilities, the collection of all its claims and the liquidation of all its debts. A Commission was created under the said General Order to ascertain the assets and liabilities of the "Diputación Provincial", to receive all its property and to distribute the same among the different departments. The said General Order reads as follows:

"I.—The existence of the body known as the "Diputación Provincial" being considered as wholly unnecessary and incompatible with the present administration of public affairs, it is hereby discontinued and abolished. The responsibilities as well as the duties heretofore performed by the said "Diputación Provincial", are distributed and assigned as follows":

"II.—The Secretary of State (Secretario de Gobernación) will take charge of all matters appertaining to charitable institutions, public health, and of the examination of accounts which were formerly in charge of the "Diputación Provincial".

"III.—The Secretary of the Interior (Fomento) will have charge of all matters relating to public works and education that were formerly in charge of the "Diputación Provincial".

"IV.—The Secretary of Finance (Hacienda) will have charge of the now existing assets and liabilities of the "Diputación Provincial", the collection of all its claims and the liquidation of all its debts".

"V.—A Commission is hereby created consisting of............whose duty it

putación Provincial, recibir toda su propiedad y distribuir la misma entre los varios departamentos. Dicha Orden es la siguiente :

"I.   La Corporación conocida con el nombre de "Diputación Provincial" queda suprimida desde esta fecha y cesa en sus funciones, por considerarla completamente innecesaria é incompatible con la actual administración pública.   Las responsabilidades así como las atribuciones hasta ahora correspondientes á dicho centro, serán repartidas y asignadas de la manera signiente :

II.   El Secretrrio de Gobernación se hará cargo de todos los asuntos relativos á instituciones de beneficencia, sanidad y exámen de cuentas, que estaban antes encomendados á la "Diputación Provincial."

III.   Al Secretario de Fomento pasarán todos los asuntos pertenecientes á Obras Públicas é Instrucción, que estaban á cargo de la "Diputación Provincial."

IV.   El Secretario de Hacienda se hará cargo del activo y pasivo de la "Diputación Provincial," recaudación de todos sus créditos y liquidación de todas sus deudas.

V.   Se crea una comisión compuesta de ....................................... cuya obligación será cerciorarse del activo y pasivo de la "Diputación Provincial," recibir todas sus propiedades y distribuir las mismas entre los distintos departamentos del Gobierno, de la manera antes mencionada.   La comisión se reunirá por citación del Presidente."

La división de la propiedad de la extinguida Diputación Provincial no parecía encontrar obstrucción ú obstáculo, pero como era natural, se desarrollaban cuestiones enojosas y controversias en el arréglo de su activo y pasivo.   Por esta razón al parecer el Gobierno Militar dictó la Orden General No. 84 de fecha 18 de Abril de 1900, adicional y posterior á la anterior, y cuya orden fué una medida mesurada y prudente para satisfacer todos los incidentes.   Dicha Orden creó también otra comisión para *"recibir, oir y decidir todas las reclamaciones de la extinguida Diputación Provincial."*   Dicha Orden General contiene una sábia disposición en la índole de un estatuto de prescripción, excluyendo toda reclamación no presentada dentro de seis meses.   Dicha comisión tenía autoridad para aprobar ó impugnar cualquiera reclamación que se presentase, pero no siendo de

shall be to ascertain the assets and liabilities of the "Diputación Provincial", to receive all its property and to distribute the same among the different departments of the government as mentioned above. The Commission will meet at the call of the President".

The distribution of the property of the late "Diputación Provincial" did not seem to meet with any obstruction or obstacle, but, as was natural, vexatious questions and controversies came up in the settlement of its assets and liabilities. For this reason, it seems, the Military Government issued General Order No. 84, of April 18, 1900, additional to and complementary of, the previous one, which order was a moderate and wise measure to dispose of all incidental issues. The said Order, also created another Commission "to receive, hear and decide upon all claims against the late "Diputación Provincial". The said General Order contains a wise provision in the nature of a statute of limitation, excluding all claims not presented within six months. The said Commission was authorized to approve or disallow any claim presented, but as it had no judicial character, its awards were not final, and when any claim was disallowed, it was transmitted to the District Court for adjudication under the proceedings called "contencioso-administrativo" (litigative-administrative) proceedings.

Section III of General Order No. 84, reads as follows:

"III.—A Commission is hereby constituted to be composed of Messrs. Rafael Nieto Abeillé, J. H. Hollander and J. R. Garrison, to receive, hear and decide upon all claims against the said late "Diputación Provincial", or arising out of contracts with that body, which may be presented to the said Commission within the period of six months from the date of this Order. All claims not presented within said time shall thereafter be forever barred".

And Section VI of the same Order reads:

"VI.—In case any award of the Commission shall be disapproved by the Governor, or where the decision of the Commission is not unanimous, or where the claimant declines to accept the award of the Commission, the certificate of the Commission, together with the claim and the evidence in support thereof, and all papers pertaining thereto will be transmitted by the Governor to the District Court of San Juan, with such statement as the Governor shall

un carácter judicial su resolución no era definitiva, y cuando alguna reclamación era impugnada, se trasmitía á la Corte de Distrito para su adjudicación de acuerdo con dicho procedimiento de lo contencioso-administrativo.

El artículo III de la Orden General No. 84 es como sigue:

"III.    Constitúyese por la presente una Comisión compuesta de los Sres Rafael Nieto Abeillé, J. H. Hollander y J. R. Garrison para recibir, oir y resolver todas las reclamaciones contra la extinguida Diputación Provincial, ú originadas en contrato con ella, que se presenten á dicha Comisión dentro de seis meses á partir de la fecha de esta Orden.    Toda reclamación que no se presentare dentro del término señalado se declarará para siempre caducada.

Y el artículo VI de la misma dice :

"VI.    En caso de que una adjudicación dictada por la Comisión fuere desaprobada por el Gobernador, ó el dictámen de la Comisión no resultare unánime, ó el interesado se resistiere á aceptar el fallo de la Comisión, el certificado de dicho fallo, acompañado de la reclamación y pruebas en que se apoya, como también todos los documentos relacionados con la misma, se remitirán por el Gobernador á la Corte de Distrito de San Juan con las observaciones que dicha autoridad tuviere por conveniente someter sobre el particular; seguidamente el Tribunal á instancia de cualquiera de las partes, procederá á considerar y resolver la reclamación por lo contencioso-administrativo, y si el fallo resultare á favor del acreedor, copia certificada del mismo se remitirá al Contador General, por conducto del Gobernador, para su liquidación y pago por el Tesorero, en la forma ya indicada."

Una mayoría de la Comisión impugnó las reclamaciones aquí controvertidas, y de acuerdo con los métodos y procedimientos establecidos por dicha Orden General y la ley en vigor en Puerto Rico, el presente caso llegó á esta Corte.

Para llegar á una decisión justa y razonable del litigio, hemos citado varias decisiones de los Tribunales más altos de los Estados Unidos, y la forma en que han sido mirados y juzgados casos de lotería, y aún juegos de azar y otros similares.    Hemos también tratado de citar las conclusiones de las cortes en tales contratos, las épocas y lugares, cuando y donde dichos incidentes y transacciones se consideraban legales.    Observamos que las cortes muy á pesar suyo, decidieron á favor de los demandantes, pero aquellas tienen el deber de aplicar la ley tal como está escrita, *"dura lex sed lex"*.

desire to submit in the premises ; and thereupon the said Court at the request of either party shall proceed to consider and determine the claim under the proceeding now in force, called *Contencioso-Administrativo;*......... and where the judgment is in favor of the claimant, an attested transcript thereof shall be transmitted to the Auditor, through the Governor, for settlement and payment by the Treasurer in the manner aforesaid".

A majority of the Commission opposed the claims here controverted and pursuant to the methods and proceedings established by the said General Order, and the law in force in Porto Rico, the present case was taken to this Court.

To arrive at a just and reasonable decision of the litigation, we have cited several decisions of the highest Courts of the United States and the manner in which lottery cases, and even games of chance and the like have been viewed and adjudged. We have also endeavored to cite the conclusions of the Courts upon such contracts, and the times and places when and where the said incidents and transactions were considered legal. We observe that the Courts, with great reluctance, decided in favor of the plaintiffs, but they are bound to apply the law as it is written : *dura lex, sed lex.* Courts can not legislate. These functions appertain to the legislatative branch of the Government for the purpose of repealing abominable statutes, which has been done in almost all the States of the Union.

In the cases mentioned, where the owners of lotteries were the plaintiffs, privileges and rights acquired were always respected, so long as the lottery system existed, but once repealed or prohibited, rights acquired were not recognized *in respect only to the owner of the lottery.* But here lottery had not been repealed nor prohibited, but the owner thereof, the "Diputación Provincial", this Corporation or Institution which was legally authorized by the Royal Government of Spain to conduct a game of lottery, was abolished. This suit, however, is not brought by the owner of the lottery, but by holders of lottery tickets. We find no jurisprudence as to a ticket holder against the

Las cortes no pueden legislar. Estas funciones pertenecen al ramo legislativo del Gobierno para derogar estatutos detestables lo cual se ha llevado á cabo en casi todos los Estados de la Unión.

En los casos mencionados, en los que los dueños de loterías eran los demandantes, se respetaron siempre los privilegios y derechos adquiridos, mientras el sistema de lotería estaba en vigor pero una vez derogado ó prohibido no se reconocían derechos adquiridos *en lo que respecta al dueño de la lotería solamente.* Pero aquí no se había derogado ni prohibido la lotería, sinó que el dueño de la misma, la Diputación Provincial, esta corporación ó institución, que estaba *legalmente* autorizada por el Gobierno Real de España para conducir el juego de lotería, fué disuelta. Este pleito, sin embargo, no se instituye por el dueño de la lotería, sino por el tenedor de billetes de lotería. No encontramos jurisprudencia de un tenedor de billetes contra el dueño de una lotería, pero si encontramos precedentes de demandantes contra el dueño de la lotería y también decisiones dictadas en los Estados Unidos, en contratos de juego, que considero aplicables al presente caso. Nos dice el Honorable Fiscal, como un fundamento de derecho, que la *lotería es un juego de azar.* Estoy de acuerdo con él, pero esta clase de juego de azar, era de la índole de un contrato aleatorio, sancionado y autorizado por la autoridad suprema. Ante las cortes de los Estados Unidos, una persona bajo estas condiciones, hubiera podido recobrar su dinero invertido ó pagado en un contrato de juego de azar aún cuando por alguna circunstancia el juego no hubiese tenido efecto, y como la lotería era legal de acuerdo con las leyes de España, una persona hubiera podido hacer valer sus derechos en un procedimiento de rescisión ó violación de contrato." En virtud de la Orden General número 17, los distintos departamentos se convirtieron en los sustitutos ó quizás los sucesores de la Diputación Provincial. Recibieron su propiedad, muebles é inmuebles, y se asignaron al Tesorero los deberes de "*hacerse cargo del*

owner of a lottery, but we do find precedents as to plaintiffs against the owner of the lottery, and also decisions delivered in the United States in gaming contracts, which I consider applicable to the present case. The Hon. Fiscal tells us, as a legal proposition, that lottery is a *game of chance.* I agree with him. But this class of game of chance was in the nature of an aleatory contract, sanctioned and authorized by the supreme authority. In the Courts of the United States a person, under such circumstances, could have recovered the money invested or paid in a gaming contract, even when, for some reason, the game could not take place, and as the lottery was legal under the laws of Spain, a person could have asserted his rights in a proceeding for rescission or violation of a contract. By virtue of General Order No. 17, the different departments became the substitutes or, perhaps the successors, of the "Diputación Provincial". They received its property, real and personal, and the Treasurer was assigned the duties to *"have charge of the assets and liabilities of the "Diputación Provincial"*, the collection of all its claims and the liquidation of all its debts". No provision of the Treaty between the United States and the Kingdom of Spain would be violated in ratifying the judgment of the District Court. This is not a suit against the Government of the United States, but simply an action against a branch or department of the Insular Government, the Treasurer, in the manner authorized by said General Orders. Whether the claims of the plaintiffs in this suit should be considered of such a nature that the Military Government, based upon law and justice, could have placed an obstacle in the way of their successful prosecution, is a point which we need not discuss, in view of the fact that it was not done. On the contrary, pursuant to the said Military Orders, the plaintiffs were permitted and granted the same right and remedy against the Treasurer that they had or might have had, against the "Diputación Provincial", had it not been abolished, and we

*activo y pasivo de la "Diputación Provincial" recaudación de todos sus créditos y liquidación de todas sus deudas".* No se violaría ninguna disposición del tratado entre los Estados Unidos y el Reino de España al ratificar la sentencia de la Corte de Distrito. No es este un pleito contra el Gobierno de los Estados Unidos, sino simplemente una acción contra un ramo ó departamento del Gobierno Insular, el Tesorero, en la forma autorizada por dichas Ordenes Generales. Si las reclamaciones de los demandantes en este pleito hubieran podido considerarse de tal índole que el Gobierno Militar pudiera, fundándose en la ley ó en la justicia, haber puesto un obstáculo para que se admitieran y prosperaran, es un punto que no necesitamos discutir en vista del hecho de que no se hizo: antes al contrario, de acuerdo con dichas Órdenes Militares se permitió y concedió á los demandantes el mismo derecho y recurso contra el Tesorero que tenían ó podrían haber tenido contra la Diputación Provincial, si no hubiera sido abolida; y hemos demostrado que tal derecho y recurso existió contra la Diputación Provincial, por el dinero que recibió á consecuencia de la promesa de verificar sorteos. El Gobierno de los Estados Unidos, en virtud del tratado, se convirtió en el dueño de toda la propiedad y derechos del *Gobierno de España en Puerto Rico*, pero no adquirió título ni propiedad en nada de lo que pertenecía á la Diputación Provincial. Este hecho está demostrado claramente por las disposiciones de las Órdenes Militares Generales nombrando una comisión para recibir y distribuir dicha propiedad entre los varios departamentos *insulares* creados por dichas Órdenes. Esta aserción está evidenciada por la circunstancia adicional, inequívoca y notoria y de la cual este Tribunal puede y debe tomar conocimiento judicial, que existen aun en la actualidad reclamaciones de propiedad y derechos que el Gobierno Insular reclama en contra del Gobierno Nacional. La Corte Suprema de los Estados decidió en el caso de Leitensdorfer vs. Webb, 20th Nov. 176, como sigue:

"Es un principio reconocido de la Ley Internacional que los habitantes

have shown that such right and remedy did exist against the "Diputación Provincial", for the money it had received in consequence of the promise to hold the drawings. The Government of the United States, by virtue of the Treaty, became owner of all the property and rights *of the Government of Spain in Porto Rico*, but acquired no title nor property in anything belonging to the "Diputación Provincial". This fact is clearly shown by the provisions of the Military Orders appointing a Commission to receive and distribute the said property among the various *insular* departments created by the aforesaid Orders. This assertion is borne out by the further unequivocal and notorious circumstance, and of which this Court may and should take cognizance, that there exist, even now, claims of property and rights which the Insular Government demands against the National Government. The Supreme Court of the United States decided, in the case of Leitensdorfer v. Webb, 20 Howard, 176, as follows:

"The settled principle of the law of nations, that the inhabitants of a conquered territory change their allegiance, and their relation to their former sovereign is dissolved; but their relations to each other, and their rights of property not taken from them by the orders of the conqueror, remain undisturbed".

The Government of the United States, that is the *conqueror*, did not take away this right of property, this cause of action, for the money due by the "Diputación Provincial" to the plaintiffs, but, on the contrary, *the Military Government, the representative of the United States*, was the one that left these claims to be decided upon by means of an investigation and award. It would have been a violation of the principle "of the law of nations as established by the highest authorities", and applicable to the present case, were the plaintiffs deprived of their rights acquired against the "Diputación Provincial", and now against the Treasurer who received the assets and had charge of the payment of all the debts. Taking into account the character of the

de un territorio conquistado cambian su fidelidad y cesan en sus relaciones con su anterior soberano; pero las relaciones entre ellos mismos y sus derechos de propiedad que no les hayan sido quitados permanecen en la misma forma que antes."

El Gobirno de los Estados Unidos, ó sea el *conquistador*, no quitó este derecho de propiedad, esta causa de acción, por el dinero adeudado por la Diputación Provincial á los demandantes, sino por el contrario, *el Gobierno Militar, el representante de los Estados Unidos,* fué el que dejó estas reclamaciones para ser decididas por medio de investigación y adjudicación. Hubiera sido una violación del principio "de la ley de las naciones según ha quedado establecido por las autoridades más altas," y aplicable al presente caso, el privar á los demandantes de sus derechos adquiridos contra la Diputación Provincial, y en la actualidad contra el Tesorero quien recibió el activo y se encargó del pago de todas las deudas. Teniendo en cuenta la índole de la Diputación Provincial, el presente litigio es de la misma naturaleza que si ocurriera entre dos ciudadanos y éstos no pueden ser lastimados en sus derechos. La teoría de que los demandantes tendrían que seguir la pista del dinero que ellos pagaron de buena fé por los billetes de lotería, de acuerdo con la autoridad de la ley, hasta las mismas arcas de la Diputación Provincial, serían en extremo extravagante. Los hechos alegados y que no han sido negados, demuestran que la Diputación Provincial, necesitada de dinero, vendió los billetes y dedicó el producto de dicha venta á cubrir sus emergencias. Pero si fuese de otra manera la Corte exigiría un imposible y demandaría algo fuera del conocimiento de los demandantes. El Departamento del demandado recibió y tomó posesión y dominio del activo y de las propiedades de la extinguida Diputación Provincial, de cuya fuente podrían solamente obtenerse dichos informes. El "onus probandi" queda á su cargo. De aquí que esa aserción deba desestimarse inmediatamente. Si la Diputación Provincial ó el Tesorero no conservó los fondos de la lotería separados,

"Diputación Provincial", the present controversy is of the same nature as one which might occur between two citizens, and the rights of these should not be impaired. The theory that the plaintiffs would have to follow the track of the the money paid by them in good faith for the lottery tickets, to the very vaults of the "Diputación Provincial", is extremely extravagant. The facts alleged, which have not been contradicted, show that the "Diputación Provincial", being in need of money, sold the tickets and applied the proceeds of the sale to meet its emergencies. But were it otherwise, the Court would be demanding an impossibility, something beyond the knowledge of the plaintiffs. The department of the defendant received and took possession of the assets and property of the late "Diputación Provincial", from which alone could such information be obtained. The *onus probandi* rests with it. Hence that assertion should be forthwith ruled out. If the "Diputación Provincial" or the Treasurer, did not keep the lottery funds apart, but mixed them with other funds, the laws of all civilized countries agree as to what should be the consequences thereof. In view of the facts set forth and the allegations of the parties, and of the law adduced, I am of opinion that the plaintiffs would have had a legal right against the "Diputación Provincial", under the Spanish Government; and by virtue of the transfer, directed by the aforesaid General Orders, they have a just claim against the Treasurer of Porto Rico.

sino que los mezcló con otros fondos, las leyes de todos los países civilizados están acordes en cuanto á lo que deban ser las consecuencias de lo mismo.   En vista de los hechos expuestos y de las defensas de las partes y de la ley aducida, opino que los demandantes hubieran tenido un derecho legal contra la Diputación Provincial bajo el Gobierno Español; y en virtud del traspaso, ordenado por las citadas Órdenes Generales, tienen reclamación justa contra el Tesorero de Puerto Rico.